**AFFIRM; and Opinion Filed August 10, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-01056-CV

### BEN CAMPBELL, INDIVIDUALLY AND D/B/A MY RIGHT TO KNOW, MYRIGHTTOKNOW.ORG, AND YOUR RIGHT TO KNOW, AND YOUR RIGHT TO KNOW, INC., Appellants

### V.

### RAY CLARK, Appellee

### On Appeal from the 422nd Judicial District Court
### Kaufman County, Texas
### Trial Court Cause No. 90510-422

## OPINION

Before Justices Lang-Miers, Brown, and Schenck
Opinion by Justice Lang-Miers

This accelerated interlocutory appeal arises from a defamation lawsuit filed by appellee Ray Clark against appellants Ben Campbell, individually and d/b/a My Right to Know, myrighttoknow.org, and Your Right to Know, and Your Right to Know, Inc. Appellants moved to dismiss the lawsuit under the Texas Citizens Participation Act (TCPA) and the trial court denied the motion. On appeal, appellants argue that the trial court erred in denying their motion. We affirm.

## BACKGROUND

Clark was the incumbent candidate for the office of county commissioner of precinct 2 in Kaufman County in the March 2014 Republican primary election. Two days before the primary, the website myrighttoknow.org posted an article accusing Clark of helping his nephew avoid prosecution for child molestation. The article was titled "Stoney Adams Evades Child Molestation Charges for the Seventh Time" with the subtitle "Children Ages 5-17 Reportedly Sexually Abused by Kaufman County Commissioner Ray Clark's Nephew[.]" The article read in part:

> Kaufman County's Courthouse recently released documents linking Stoney Adams of Kaufman, Texas to between 5 and 7 Child Molestation and Sexual Abuse Cases.
>
> . . . .
>
> Stoney Adams' history with court justice for child abuse is, for a lack of a better word, bizarre. Three cases: Assault with Physical Contact in 2004, Sexual Assault in 2005, Assault and Indecency with a Child by Exposure in 2006 have all been dismissed.
>
> Despite the numerous allegations, Stoney was miraculously able to stay off the Registered Offenders list, and effectively hide his reported sexual deviancy. With his clean record, Lacie Adams, married to him from 2004-2010, was kept in the dark by the Kaufman County government. She has since had three children, two boys and a girl (ages 3, 5, and 7).
>
> "I am shocked and appalled that such a monster lives among us and was allowed to be around our children," said Lacie Adams, Stoney's former spouse. "I don't know how or why this man has escaped justice for this long, but he couldn't have done it without very powerful help."
>
> . . . .
>
> There has been much speculation among Kaufman County residents as to how Stoney seems to always be able to escape justice for his exploits. Stoney's uncle, Ray Clark, is the County Commissioner for the Precinct 2 of Kaufman County.
>
> The two are reportedly close. Ray Clark's powerful position in Kaufman County could allow certain clout over the judicial system, and if need be, could

potentially allow a person in this position of power to sway the outcome of a trial via close connections in the government.

Lacie Adams also confirmed the connection between Stoney Adams and Kaufman County Commissioner Ray Clark.

"Ray would often call Stoney. They would talk on the phone for hours. They would get together at least once a week. They seemed very close," stated Lacie, recounting the close bond between Ray Clark and his nephew.

While a connection between Ray Clark and Stoney is obvious, Ray Clark's involvement in Stoney's mysterious repeated case dismissals is unclear. However, Lacie is convinced that Ray Clark is involved.

"My children would never have been put through what they have been if Stoney had not been protected by his powerful connections. I am appalled that Kaufman County has allowed this injustice to continue, and I desperately hope that Stoney can be brought to justice for all that he has done," stated Lacie[.] . . .

It appears that Stoney's magical talent for evading justice for child sexual abuse is ongoing. Stoney's most recent case for Felony-Sexual Assault was to be heard in court on Wednesday, February 19th, 2014. It never happened.

My Right to Know is a non-profit organization devoted to the discovery and prevention of sexual abuse and the registry of sexual offenders.

My Right to Know also sent the following mailer to Kaufman County residents right before the primary, which included pictures of Clark and Stoney Adams, repeated several of the allegations in the article, and directed readers to "FIND MORE DETAILS AT WWW.MYRIGHTTOKNOW.ORG[.]"





Appellant Ben Campbell and a man named Michael Hendrix were directors of Your Right to Know. Hendrix's advertising company, Precise Agency, LLC, ran advertising for Clark's opponent, Skeet Phillips. After Phillips defeated Clark in the Republican primary, Hendrix posted on a personal webpage, "Precise Agency and Red Digital Media Brought It Home In The 2014 Texas Republican Primary Elections!" He continued:

> Just leaving our offices from working almost 48 hours straight on our clients['] GOTV efforts. I Will Sleep Well Knowing That Precise Agency Has Been Nominated for Campaign and Elections MVP. I almost forgot to show some "Love" to the InForneyNews for their "Share" on some of my work even if they did think it was a little hard core . . . [.]

> MY RESPONSE to the To The [sic] Press Is Simply Stated: My job is to win elections for my clients. After looking back on the Texas Primary Elections I have no regrets. We Get Paid After All To Bring It Home and We Do!

After Clark lost, he sued appellants for defamation (libel per se and libel per quod). Appellants answered with a general denial and a request for sanctions under chapter ten of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 10.001 (West 2002). Appellants also moved to dismiss Clark's lawsuit under the TCPA. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005 (West 2015). Their amended answer—the live pleading at the time of the hearing on their motion to dismiss—was similar but added the affirmative defenses that Clark's claims are barred by the TCPA and by the federal Communications Decency Act.

The motion was supported by Campbell's affidavit. In his affidavit, Campbell stated that Your Right to Know created the myrighttoknow.org website and identified the sources Your Right to Know used for its online article and mailer about Clark and Stoney Adams and Lacie Adams. Campbell also testified that he checked the sources and believed them to be accurate:

> I followed up on the concerns that had been raised about the dismissals and delays in cases involving Stoney Adams. I hired an appropriate person to address the issues before either the website posting or the mailer was released. I personally made sure that Lacie's opinion was accurately quoted and that any information not directly quoted was not substantively changed in the editing process. I had no knowledge that anything in the releases was factually incorrect.

Clark responded to the motion to dismiss and supported his response with his affidavit testimony. Clark testified:

> Stoney Ray Adams is not my nephew. I have never referred to him as such. We are not related by consanguinity. My wife has a sister who is married. My wife's sister's husband has a sister. That person is the mother of Stoney Adams. I do not consider us to be relatives.
>
> I do not have a relationship with Lacie Adams or her children. I would not consider Lacie Adams' children to be my "grandnieces" or "grandnephews."
>
> . . . .
>
> I have never contacted the 86th District Court or the District Attorney in regard to any pending criminal case. I have never had anyone do so on my behalf. I have never provided any support or assistance to Stoney Adams regarding any criminal case.

–6–

I have never been investigated for kidnapping, child molestation, abuse of office, improper influence, or any other crime which the Defendants have imputed through their statements.

I received Defendant's [sic] mailer at my home, and I have seen the article which was contained on Defendant's website. Defendant's statements falsely associate me with kidnapping, child molestation, and of abusing my office and improperly influencing criminal proceedings[.]

. . . .

Lacie Adams has never approached me with any concerns regarding Stoney Adams.

I was never contacted by any of the Defendants or any other person to verify the truthfulness of the statements contained on the website and mailer, including those attributed to Lacie Adams.

Defendant [sic] published statements on his mailer and website which included my name and likeness, and which referred to me.

Defendant's statements were false and defamatory against me.

Defendant acted with actual malice with regard to the truth of the statements.

The trial court denied appellants' motion to dismiss, finding that "the Plaintiff, Ray Clark, has established by clear and specific evidence a prima facie case for each element of the claim in question[.]" Appellants appeal that ruling.

## THE TCPA AND STANDARD OF REVIEW

The TCPA, chapter 27 of the civil practice and remedies code, protects citizens from retaliatory lawsuits that seek to silence or intimidate them on matters of public concern. *In re Lipsky*, 460 S.W.3d 579, 586 (Tex. 2015) (orig. proceeding); *see generally* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001–.011 (West 2015).

The TCPA's purpose is to identify and summarily dispose of lawsuits designed only to chill First Amendment rights, not to dismiss meritorious lawsuits. *See* TEX. CIV. PRAC. & REM. CODE[] § 27.002 (balancing "the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law" against "the rights of a person to file meritorious lawsuits for demonstrable

–7–

injury"). To accomplish its purpose, the Act endorses a summary process, requiring judicial review of the pleadings and limited evidence, typically within 150 days following service. TEX. CIV. PRAC. & REM. CODE[] §§ 27.003(b), .004(a), .005(a)[.]

*In re Lipsky*, 460 S.W.3d at 589–90.

The defendant-movant has the initial burden to show by a preponderance of the evidence that the case is based on, relates to, or is in response to the party's exercise of the right of free speech, to petition, or of association. TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.003, 27.005(b); *In re Lipsky*, 460 S.W.3d at 586. If the movant satisfies this burden, then the burden shifts to the plaintiff to establish "by clear and specific evidence a prima facie case for each essential element of the claim in question." TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b), (c); *In re Lipsky*, 460 S.W.3d at 587.

We review a trial court's ruling on a chapter 27 motion to dismiss de novo. *Cruz v. Van Sickle*, 452 S.W.3d 503, 513 (Tex. App.—Dallas 2014, pet. filed). We consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based. TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a).

### APPELLANTS' BURDEN UNDER SECTION 27.005(B)

In their first issue, appellants argue that they satisfied their initial burden under section 27.005(b) because they showed by a preponderance of the evidence that Clark's lawsuit was based on, related to, or was in response to their exercise of the right of free speech and to petition.[1] TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b). More specifically, they argue that the statements were expressions of free speech on a matter of public concern because they included the issues of child molestation and government corruption and concerned a public official.

---

[1] Based on our disposition of this issue, we do not address appellants' arguments that the lawsuit was related to their right to petition.

Under the TCPA, the "[e]xercise of the right of free speech" means "a communication made in connection with a matter of public concern." Tex. Civ. Prac. & Rem. Code Ann. § 27.001(3). A "[m]atter of public concern" includes an issue related to "health or safety[,]" "community well-being[,]" "the government[,]" or "a public official or public figure[.]" *Id.* § 27.001(7)(A)–(D). To determine whether a lawsuit is related to the exercise of free speech, "we must look to the context of the communication in which the allegedly defamatory statement is made." *Shipp v. Malouf*, 439 S.W.3d 432, 437 (Tex. App.—Dallas 2014, pet. denied), *disapproved on other grounds by In re Lipsky*, 460 S.W.3d at 587, 591.

The article and mailer at issue in this case contained statements concerning alleged crimes and government corruption implicating an incumbent county commissioner. Based on the context of the communications, we conclude that the statements in the article and mailer relate to matters of public concern under chapter 27. *See Backes v. Misko*, No. 05-14-00566-CV, 2015 WL 1138258, at *9 (Tex. App.—Dallas Mar. 13, 2015, no pet.) (mem. op.) (finding internet posting related to health and safety that "was not on someone's personal blog or contained in private e-mails between individuals, but rather written in a public internet forum frequently visited by others" was communication concerning an issue of public concern); *see also Shipp*, 439 S.W.3d at 438 ("[T]he legislature expressed its intent that the statute, enacted to protect the right of free speech, be construed broadly.").

As a result, we conclude that appellants have satisfied their initial burden to establish by a preponderance of the evidence that Clark's suit was based on, related to, or was in response to the exercise of the right of free speech. Having reached that conclusion, we sustain appellants' first issue.

In their second issue, appellants argue that Clark did not satisfy his burden to establish by clear and specific evidence a prima facie case for each element of his claims.

The Texas Supreme Court recently explained that the phrase "clear and specific evidence" as used in the TCPA requires a plaintiff to "provide enough detail to show the factual basis for its claim." *In re Lipsky*, 460 S.W.3d at 590–91.  In other words, to avoid dismissal of a defamation claim under the TCPA, a plaintiff must present "pleadings and evidence that establish[] the facts of when, where, and what was said, the defamatory nature of the statements, and how they damaged the plaintiff[.]"  *Id.* at 591.

To recover for defamation in Texas, a plaintiff must prove that the defendant (1) published a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) while acting with actual malice, if the plaintiff was a public official or public figure, and (4) which caused damages, unless the defamatory statements were defamatory per se.  *In re Lipsky*, 460 S.W.3d at 593.  Appellants argue that Clark has not presented clear and specific evidence to establish a prima facie case (1) that the statements at issue were defamatory and (2) that they were made with actual malice.  We disagree.

## Defamatory Statements

Whether a statement is defamatory is initially a question of law for the court.  *Backes*, 2015 WL 1138258, at *12.  A defamatory statement "tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule" or "to impeach any person's honesty, integrity, virtue, or reputation[.]"  TEX. CIV. PRAC. & REM. CODE ANN. § 73.001 (West 2011); *see Backes*, 2015 WL 1138258, at *12.  A statement may be unpleasant, abusive, false, or objectionable without being defamatory in light of the circumstances.  *Backes*, 2015 WL 1138258, at * 12.  A statement must assert an objectively verifiable fact, rather than an

opinion, to be actionable. *Id.* But "an opinion, like any other statement, can be actionable in defamation if it expressly or impliedly asserts facts that can be objectively verified." *Avila v. Larrea*, 394 S.W.3d 646, 655, 658 (Tex. App.—Dallas 2012, pet. denied) (quoting *Palestine Herald-Press Co. v. Zimmer*, 257 S.W.3d 504, 509 (Tex. App.—Tyler 2008, pet. denied)). We classify a statement as fact or opinion based on the verifiability of the statement and the entire context in which the statement is made. *Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002). Whether a statement is a constitutionally protected opinion or an actionable statement of fact is a question of law. *Main v. Royall*, 348 S.W.3d 381, 389 (Tex. App.—Dallas 2011, no pet.).

Additionally, we construe an allegedly defamatory publication as a whole in light of the surrounding circumstances and based upon how a person of ordinary intelligence would perceive it. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000); *Main*, 348 S.W.3d at 390; *see City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005) ("[P]ublications alleged to be defamatory must be viewed as a whole—including accompanying statements, headlines, pictures, and the general tenor and reputation of the source itself."). A "person of ordinary intelligence" is one who "exercises care and prudence, but not omniscience, when evaluating allegedly defamatory communications." *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 157 (Tex. 2004); *Main*, 348 S.W.3d at 390; *see also New Times*, 146 S.W.3d at 157 ("The appropriate inquiry is objective, not subjective."). "Because a publication's meaning depends on its effect on an ordinary person's perception, courts have held that under Texas law a publication can convey a false and defamatory meaning by omitting or juxtaposing facts, even though all the story's individual statements considered in isolation were literally true or non-defamatory." *Turner*, 38 S.W.3d at 114.

Appellants contend that the statements they made were not defamatory, but rather were "accurate quotations, opinions, and at most, rhetorical hyperbole in the context of a political

campaign." To support their argument, appellants rely upon three cases: *Avila*, *Rehak Creative Services, Inc. v. Witt*, 404 S.W.3d 716 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) *disapproved on other grounds by In re Lipsky*, 460 S.W.3d at 587, 591, and *American Heritage Capital, LP v. Gonzalez*, 436 S.W.3d 865 (Tex. App.—Dallas 2014, no pet.). We conclude that these cases are distinguishable.

*Avila* involved statements made about a lawyer in two television broadcasts, including the title of the broadcast, "Lawyer in Dallas Defrauding the Undocumented?" and the statement that a case was a "nightmare" for a client's family. 394 S.W.3d at 650, 659. Appellants quote our statement in *Avila* that a protected expression of opinion includes a term that "by its nature" is "an indefinite or ambiguous individual judgment that rests solely in the eye of the beholder" or a "loose and figurative term employed as a metaphor or hyperbole." 394 S.W.3d at 659. They argue that the article and mailer at issue here "were ambiguous individual judgments." We do not agree. The complained-of statements in this case were not posed as a question, nor are they—like "nightmare" in *Avila*—employed as figurative terms and opinions that cannot be objectively verified. *See id.* And even a statement conveying Lacie Adams's opinion can be actionable in defamation "if it expressly or impliedly asserts facts that can be objectively verified." *Id.* at 658.

*Rehak* is also distinguishable. In *Rehak*, an advertising agency, Rehak Creative Services, Inc. and its officer and owner, Robert Rehak (collectively Rehak), sued Ann Witt, who ran unsuccessfully in the Republican primary for the Texas House and her campaign committee, campaign treasurer, and campaign website manager (collectively Witt). Rehak sued Witt for various claims including libel based on statements on Witt's campaign website. *Rehak*, 414 S.W.3d at 722. Witt accused her primary opponent, Jim Murphy, of "sidestep[ping]" the Texas Constitution by serving as a legislator while receiving payment as a consultant for a municipal

management district called Westchase District.  *Id.* at 720.  On a Witt campaign website entitled "How to Succeed in Government Without Really Trying[,]" Witt likened Murphy to the main character—J Pierrepont Finch—in the book, musical, and movie, *How to Succeed in Business Without Really Trying*.  The website accused Murphy of "ripping off taxpayers."  *Id.* at 721.  And it maintained, "For professional politician Jim Murphy, it takes just 6 sleazy steps" and included, "STEP 6: Reward your supporters with government contracts."  *Id.*  Text under Step 6 referred to Rehak Creatives Services, Inc. as one of the companies that Westchase District awarded contracts to and whose CEOs had contributed to Murphy's campaign.  *Id.* at 722.  At the bottom of the screen appeared the words: "Double Dipping.  Skirting the Law.  Bilking Taxpayers.  Rewarding Cronies.  It's time to end Jim's run."  *Id.* at 721.

Rehak argued that the words "[r]ewarding," "ripping off," and "[b]ilking" as used in the context of Witt's "How to Succeed" campaign website were defamatory statements of fact.  *Id.* at 729.  The court concluded that, viewed as a whole and in context, "a person of ordinary intelligence would perceive" the challenged statements "as nothing more than rhetorical hyperbole" and not defamatory statements of fact concerning Rehak.  *Id.* at 729–30.  The court noted that the "website's tone" and the "campaign context" of the statements reinforced the court's conclusion "regarding the ordinarily intelligent person's perceptions" and the understanding of the non-dullard "that political advertising cannot necessarily be taken at face value."  *Id* at 730.  The court stated that the website's tone included references to Murphy as a "professional politician" and "bureaucrat" and to "that pesky Texas Constitution[.]"  The court stated that the website's analogy between a character in a famous musical and an elected legislator "demonstrates an attempt to deliver a political message about the use of public money in an exaggerated, provocative and amusing way."  *Id.* at 730.  The court concluded that this type of communication lies at "the heart of the First Amendment[.]"  *Id.* (quoting *Hustler Magazine,*

*Inc. v. Falwell*, 485 U.S. 46, 50 (1988)); *see Bentley*, 94 S.W.3d at 580 (noting constitutional protection for rhetorical hyperbole made "in debate over public matters").

Appellants argue that the statements that Clark complains of are "much less strong and direct" than the language the court concluded was not defamatory in *Rehak*. They contend the language at issue here "is equally related to a campaign" and was, "at most, rhetorical hyperbole[.]" We again disagree. "'Rhetorical hyperbole' has been defined as 'extravagant exaggeration [that is] employed for rhetorical effect.'" *Backes*, 2015 WL 1138258, at *14 (quoting *Am. Broad. Cos. v. Gill*, 6 S.W.3d 19, 30 (Tex. App.—San Antonio 1999, pet. denied)). Unlike in *Rehak*, the tone of the website article and mailer in this case was not "exaggerated, provocative and amusing[.]" The tone of the article and mailer in this case was set by the statement "Children Ages 5-17 Reportedly Sexually Abused by Kaufman County Commissioner Ray Clark's Nephew." The publications did not employ extravagant exaggeration for rhetorical effect when stating that Stoney Adams was Clark's nephew, that there had been "much speculation" concerning how the perpetrator, Stoney Adams, "seems to always escape justice for his exploits[,]" that Ray Clark—as a county commissioner—could have "clout over the judicial system[,]" and that someone in his position could potentially "sway the outcome of a trial[.]"

*American Heritage* is likewise distinguishable. In that case, we concluded that the statements posted on various websites about a mortgage company were not defamatory. *American Heritage*, 436 S.W.3d at 868–69, 875–76. One statement was "The guy that was supposed to handle closing could barely speak english [sic]." We concluded that this statement (1) was a nonactionable statement of opinion because it could not be objectively verified and (2) did not rise to the level of being defamatory because it was not egregious enough to impeach the company's honesty, tarnish its reputation, or expose it to ridicule or financial injury. *Id.* at 857. Another statement was "At one point they asked for an explanation of $200 out of a $30,000

deposit to make sure we were not 'borrowing money' for closing. It was my sons [sic] birthday money for god's sakes!!!!" We concluded that this was a statement of subjective opinion and not defamatory. *Id.* at 876. Finally, we concluded that the statement that employees "were incompetent" was a nonactionable opinion and the statement that a company required additional "things" after promising a quick closing was implicit criticism and was not egregious enough to be defamatory. *Id.* Relying on *American Heritage*, appellants contend that the statements Clark complains about here were opinions and "were conjecture and not statements of absolute fact." Again, we disagree. Unlike the statements of conjecture and opinion in *American Heritage*, statements in the article and mailer—including statements not associated with Lacie Adams's views and that accused Clark of corruption in obstructing justice—were presented as objectively verifiable.

Appellants also argue that the statement "Lacie is convinced that Ray Clark is involved" did not "allege that [Clark] was engaging in improper influence" but rather "simply raised the issue by relaying Ms. Adams' concerns." But "[m]erely expressing a defamatory statement in the form of an 'opinion' does not shield it from tort liability because opinions often imply facts." *Backes*, 2015 WL 1138358, at *12; *see Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) ("expressions of 'opinion' may often imply an assertion of objective fact"); *Bentley*, 94 S.W.3d at 582 (describing holding "that detailed accusations of corruption against a public official are not protected opinion"). As the Supreme Court has explained, if a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. *Milkovich*, 497 U.S. at 18. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. *Id.* at 18–19. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my

opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar." *Id.*; *see Backes*, 2015 WL 1138258, at *4, 14 (statements on internet posting including "[h]as anyone ever known anyone with [the] disease/issue" of Munchausen-Syndrome-by-Proxy and "[i]f you have STRONG suspicions . . . to whom do you turn them over" were not protected expressions of opinion but were assertions of an objectively verifiable fact that was defamatory, namely accusing appellant of medical child abuse).

Alternatively, appellants argue that the statements were not defamatory because they were accurately quoted and not false. They contend that the website posting and mailer did not falsely associate Clark with the crimes of kidnapping, improper influence, and child molestation but rather "clearly specified" that Stoney Adams, not Clark, was the child molester. And they argue that the article and mailer "accurately expressed" Lacie Adams's concerns that Clark might be using his influence to prevent prosecution of Stoney Adams, focusing on the following statement: "Ray Clark's involvement in Stoney's mysterious repeated case dismissals is unclear. However, Lacie is convinced that Ray Clark is involved." Appellants contend that this statement made clear that "any implication" Clark was involved with delaying Stoney Adams's prosecution "was provided by Lacie Adams, not [appellants]" and the statements "regarding Ms. Adams' beliefs were true."

But appellants cannot avoid liability for defamation by attributing statements to Lacie Adams. "[I]t is a well-settled legal principle that one is liable for republishing the defamatory statement of another." *Neely v. Wilson*, 418 S.W.3d 52, 61 (Tex. 2013); *see Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 386 (1973) (noting that a "newspaper may not defend a libel suit on the ground that the falsely defamatory statements are not its own"). In addition, the statements at issue were not solely quotations of and beliefs of Lacie Adams, but included defamatory statements not connected to Lacie Adams and her beliefs.

–16–

Also, the article specified the purported relationship: "Stoney's uncle, Ray Clark, is the County Commissioner for the Precinct 2 of Kaufman County[.]" The headline stated "Stoney Adams Evades Child Molestation Charges for the Seventh Time" and the subtitle described sexual abuse by "Kaufman County Commissioner Ray Clark's Nephew[.]" And the mailer specifically referred to Stoney Adams as "Commissioner Ray Clark's Nephew." Although the article states that Stoney Adams was the child molester, we conclude that, based upon the publication as a whole in light of the surrounding circumstances and based upon how a person of ordinary intelligence would perceive it, Clark satisfied his burden to produce clear and specific evidence to establish a prima facie case that statements in the publications were defamatory.

## Actual Malice

Appellants also argue that the trial court erred by denying their motion to dismiss because Clark did not present clear and specific evidence to establish a prima facie case on the element of actual malice.[2] To establish actual malice, Clark must show that a defamatory statement was published either with knowledge of its falsity or with reckless disregard as to its truth. *See Hearst Corp. v. Skeen*, 159 S.W.3d 633, 637 (Tex. 2005) (per curiam). The standard for reckless disregard is subjective and focuses on the conduct and state of mind of the defendants. *Bentley*, 94 S.W.3d at 591. Reckless disregard requires more than mere negligence or "a departure from reasonably prudent conduct." *Id.* (quoting *Harte-Hanks Comms., Inc. v. Connaughton*, 491 U.S. 657, 688 (1989)). It requires evidence that defendants "entertained serious doubts as to the truth of the article at the time it was published" and that defendants "actually had a 'high degree of awareness'" of the probable falsity of the statements. *See id.* (quoting *Harte-Hanks*, 491 U.S. at 688). A defendant's state of mind "can—indeed, must usually—be proved by circumstantial

---

[2] It is undisputed that Clark was a county commissioner who was a candidate in the Republican primary for that office at the time of the posting of the article and receipt of the mailer by citizens in Kaufman County. Clark acknowledges in his brief that, for him to establish a prima facie case, he must establish a prima facie case by clear and specific evidence that appellants acted with actual malice. *See Dallas Morning News, Inc. v. Mapp*, No. 05-14-00848-CV, 2015 WL 3932868, at *4 (Tex. App.—Dallas June 26, 2015, no pet. h.) (mem. op).

evidence." *Id.*; *see In re Lipsky*, 460 S.W.3d at 584 (concluding "clear and specific evidence under the" TCPA "includes relevant circumstantial evidence"). And the evidence must be viewed in its entirety. *Bentley*, 94 S.W.3d at 591.

> A lack of care or an injurious motive in making a statement is not alone proof of actual malice, but care and motive are factors to be considered. An understandable misinterpretation of ambiguous facts does not show actual malice, but inherently improbable assertions and statements made on information that is obviously dubious may show actual malice. A failure to investigate fully is not evidence of actual malice; a purposeful avoidance of the truth is.

*Id.* at 597. In addition, the supreme court has stressed that proof of actual malice is not defeated by a defendant's self-serving protestation of sincerity. *Id.* at 596 (discussing *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)). And "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant*, 390 U.S. at 732.

Appellants argue that there was a "complete absence" of any evidence of knowledge of actual falsity or reckless disregard for the truth. They contend that Clark's only attempt to provide evidence of actual malice by appellants was his conclusory statement in his affidavit— "Defendant acted with actual malice with regard to the truth of the statements"—which is not evidence. They argue that Clark's statement that he was not contacted by appellants to verify the truthfulness of the statements in the article and the mailer is not evidence of actual malice because they had no obligation to verify the truthfulness of the statements. And they contend that Campbell contacted Lacie Adams to ensure that the online material reflected "her true opinion" and "[t]hus, the statements were true" and even if they were not, he "did not recklessly disregard the truth."

Clark argues that he provided clear and specific evidence of actual malice because he provided circumstantial evidence supporting a rational inference that appellants "entertained serious doubts about the truth" of individual statements and the entirety of the publications.

–18–

Clark contends that appellants "carefully enclosed" their defamatory statements within quotation marks and attempted to qualify their statements or to show that they were "merely reporting third-party allegations[.]" And Clark maintains that their wording indicates that appellants "carefully attempted to distance themselves" from their statements, and demonstrates that they "entertained serious doubts" about the truth of the statements. In addition, Clark argues that evidence that appellants were paid to win the election for Phillips—and, as result, clearly had a motive to intentionally avoid the truth—supports a rational inference that they purposely avoided the truth or acted recklessly. Clark also contends that appellants had "obvious reasons" to doubt the veracity and objectivity of informants for the article—which consisted "at most" of only Lacie Adams and a "'political consultant' who worked for Skeet Phillips"—and yet they did not verify the reports with Clark or any other source. Lastly, Clark contends that, because the article made "outrageous claims" against Clark and cited no authority other than Adams, appellants had "obvious reasons" to doubt the article's accuracy.

In *Bentley v. Bunton*, the supreme court concluded that evidence that a talk show host, Bentley, acted with actual malice when he accused a local judge, Bunton, of being corrupt was clear and convincing.[3] 94 S.W.3d at 566–67, 602. The court concluded that Bentley's argument that he "made some investigation" by obtaining court records and conducting legal research before making his allegations did not "have much weight when there is no evidence that Bunton's investigation ever led him to contact any one of a number of other people involved in the circumstances he criticized." *Id.* at 601. Likewise, in *Harte-Hanks Communications, Inc. v. Connaughton*, Connaughton, an unsuccessful candidate for municipal judge, sued Harte-Hanks, a newspaper publisher, for libel. 491 U.S. at 660. After one of the incumbent's court officials was

---

[3] Although clear and specific evidence "sounds similar to clear and convincing evidence, the phrases are not legally synonymous." *In re Lipsky*, 460 S.W.3d at 589.

arrested on bribery charges and while a grand jury investigation of those charges was in progress, the newspaper published a front-page story quoting witness Alice Thompson stating that Connaughton "had used 'dirty tricks' and offered her and her sister jobs and a trip to Florida 'in appreciation' for their help in the investigation." *Id.* The United States Supreme Court concluded that the newspaper acted with actual malice in printing defamatory and false statements based on evidence including: (1) by the day the story appeared, six witnesses— including Connaughton—"had categorically denied Thompsons' allegations"; (2) the newspaper chose not to interview "the one witness who was most likely to confirm Thompson's account"; (3) the newspaper decided not to listen to tapes of an interview that "could easily have . . . verified or disproved" much of the published statements, even though Connaughton made the tapes available; and (4) "the hesitant, inaudible, and sometimes unresponsive and improbable tones of Thompson's answers to various leading questions [in a taped interview] raised obvious doubts about her veracity." *Id.* at 690. The court concluded that, accepting "the jury's determination that Harte-Hanks's explanations for these omissions were not credible, it is likely that the newspaper's inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of Thompson's charges." *Id.* at 692. The court noted that while a failure to investigate "will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category." *Id.* (citation omitted); *see Curtis Publishing Co. v. Butts*, 388 U.S. 130, 156 (1965) (plurality opinion) (concluding that evidence showed that a news magazine had acted with actual malice in publishing an article after a "grossly inadequate" investigation).

Similarly, in this case, although Campbell testified by affidavit that he "had no knowledge that anything in the releases was factually incorrect[,]" Campbell's "self-serving protestations of sincerity" cannot solely defeat "proof of actual malice." *Bentley*, 94 S.W.3d at

596. Likewise, although we "are mindful that a failure to investigate the facts is not, by itself, any evidence of actual malice," *id.* at 601, as in *Bentley*, "what is so striking about the record in this case is the complete absence of any evidence that a single soul, besides [Lacie Adams], ever concurred in [the] accusations of misconduct against" Clark. *Id.* Although appellants argue that Campbell contacted Lacie Adams to verify that the online material reflected "her true opinion[,]" there is no evidence that appellants contacted Clark or anyone else to verify the accuracy of the statements in the article and mailer. *Id.* at 601.

The supreme court also noted in *Bentley* that, although a defendant's ill will toward a plaintiff does not equate to actual malice, such ill will "may suggest actual malice." *Id.* at 602. Here, appellants argue that there was no evidence that they had the motive to intentionally avoid telling the truth for Phillips to win the primary election because there was no evidence that they were paid by Phillips to help him win, but only that "Precise" was paid by Phillips. There is evidence in the record, however, connecting appellants to Precise and Precise to the publication of the mailer and article.[4]

Appellants rely on *Nelson v. Pagan* in which we concluded that a journalist defendant negated actual malice as a matter of law when the evidence showed that various witnesses stated their belief in the truth of the statements and that he had numerous sources, including "many witness interviews, a thorough review of publicly available information, [] review of articles in various news sources . . . and true and impartial accounts of proceedings[.]" 377 S.W.3d 824, 833–34 (Tex. App.—Dallas 2012, no pet.). But in this case, the article and mailer quoted only

---

[4] Both Campbell and Hendrix were directors of Your Right to Know and Campbell testified by affidavit that Your Right to Know launched the website http://myrighttoknow.org. My Right to Know published the article and produced the mailer at issue. A copy of Phillips's campaign finance report reflects payment of $6,225 to "Precise" for "advertising[.]" An online posting by Hendrix, as "CEO & President at The Precise Agency Group" featured an image of the My Right to Know mailer and excerpts of the inForney.com article and stated: "Precise Agency . . . Brought It Home In The 2014 Texas Republican Primary Elections!" and "I almost forgot to show some 'Love' to the InForneyNews for their 'Share' on some of my work even if they did think it was a little hard core. . . [.]" Below the posting, Hendrix directed a question to two people asking "as mothers what did you think about the mailer?" Hendrix also stated: "My response To The Press Is Simply Stated: My job is to win elections for my clients. After looking back on the Texas Primary Elections I have no regrets. We Get Paid After All To Bring It Home and We Do!"

–21–

Lacie Adams, who was the former wife of Stoney Adams. Her accusations that Stoney could not have "escaped justice" "without very powerful help" and that "Kaufman County has allowed this injustice to continue" are unverified by another source. The evidence does not reflect that appellants made any efforts to confirm Lacie Adams's statements either through interviews or review of official records.

In addition, appellants' argument that it was not necessary for them to cite other sources because the article "was solely Adams' experience and belief" and that the website allowed Lacie Adams to "use their website" to "air her concerns" is not persuasive. Numerous statements in the article and mailer were not quotes of Lacie Adams or statements concerning or derived from her.[5] Given the seriousness of the allegations against Clark in the publications, appellants' "inaction" in confirming Lacie Adams's statements and the other allegations in the article and mailer likely may reflect a "deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the] charges." *See Harte-Hanks*, 491 U.S. at 692. We conclude that the trial court did not err in concluding that Clark established a prima facie case of actual malice by clear and specific evidence.

Consequently, we conclude that the trial court did not err in denying appellants' motion to dismiss. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005.[6] We overrule appellants' second issue. Because of our disposition, we do not address appellants' third issue that we should render judgment dismissing the case and remand to the trial court for assessment and award of attorney's fees, costs, and sanctions to appellants.

---

[5] For example, "Children Ages 5-17 Reportedly Sexually Abused by Kaufman County Commissioner Ray Clark's Nephew"; "There has been much speculation among Kaufman County residents as to how Stoney seems to always be able to escape justice for his exploits. Stoney's uncle, Ray Clark, is the County Commissioner for the Precinct 2 of Kaufman County"; and "Ray Clark's powerful position in Kaufman County could allow certain clout over the judicial system, and if need be, could potentially allow a person in this position of power to sway the outcome of a trial via close connections in the government."

[6] We conclude that Clark satisfied his burden to maintain his claims at this preliminary stage of the litigation but do not intend to indicate an opinion about whether the claims will ultimately have merit.

## CONCLUSION

We affirm the trial court's order.


                                      /Elizabeth Lang-Miers/
                                      ELIZABETH LANG-MIERS
                                      JUSTICE

141056F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

BEN CAMPBELL, INDIVIDUALLY AND
D/B/A MY RIGHT TO KNOW,
MYRIGHTTOKNOW.ORG, AND YOUR
RIGHT TO KNOW, AND YOUR RIGHT
TO KNOW, INC., Appellants

No. 05-14-01056-CV        V.

RAY CLARK, Appellee

On Appeal from the 422nd Judicial District
Court, Kaufman County, Texas
Trial Court Cause No. 90510-422.
Opinion delivered by Justice Lang-Miers,
Justices Brown and Schenck participating.

In accordance with this Court's opinion of this date, the order of the trial court is
**AFFIRMED**.

It is **ORDERED** that appellee RAY CLARK recover his costs of this appeal from
appellants BEN CAMPBELL, INDIVIDUALLY AND D/B/A MY RIGHT TO KNOW,
MYRIGHTTOKNOW.ORG, AND YOUR RIGHT TO KNOW, AND YOUR RIGHT TO
KNOW, INC.

Judgment entered this 10th day of August, 2015.