**Affirmed; Opinion Filed July 11, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-17-00278-CV

**MOHAMED MOHAMED, INDIVIDUALLY
AND ON BEHALF OF A.M., A MINOR, Appellant
V.
CENTER FOR SECURITY POLICY, JIM HANSON,
AND BEN SHAPIRO, Appellees**

On Appeal from the 162nd Judicial District Court
Dallas County, Texas
Trial Court Cause No. DC-16-12579

## OPINION

Before Justices Francis, Evans, and Boatright
Opinion by Justice Evans

Appellant Mohamed Mohamed, individually and on behalf of A.M., a minor, appeals the

trial court's granting of the motions to dismiss filed by Center for Security Policy (CSP), Jim

Hanson, and Ben Shapiro. Mohamed also appeals the trial court's refusal to reconsider the

attorney's fees award granted to Hanson and CSP. We affirm.

### BACKGROUND

#### A. Factual Background

A.M. is a Muslim and a United States citizen who emigrated with his father from Sudan to

reside in Irving, Texas. A.M., at the time of the events at issue in this appeal, was thirteen-years

old and in his freshman year of high school. On September 14, 2015, A.M. brought a homemade

alarm clock to his school and showed it to a teacher. The teacher took the device away from A.M.

and contacted a school resource officer. Later in the school day, A.M. was escorted out of class to meet with police officers and the school counselor. A.M. was later arrested and taken to the Irving Police Department for bringing a "hoax bomb" to school. The charges against A.M. were dropped by the Irving Police Department on September 16, 2015, but his school suspended him for three days for his actions.

Following A.M.'s arrest, the story attracted national news attention including the New York Times, the Dallas Morning News, the Washington Post, the New York Post and the Huffington Post. As a Washington Post article summarized,

> His parents had a choice: deal with this quietly, or tell someone. Their son had been placed in handcuffs and interrogated, in a town known for its resentment of Muslims. So they called the media, and soon [A.M.] was trending on Twitter, and everyone from Mark Zuckerberg to President Obama was sharing messages of support.

On September 16, 2015, Mohamed hosted a press conference at the family residence to respond to the arrest and to speak to the press. The Council on American-Islamic Relations (CAIR) co-hosted the press conference and noted in its press release that "the incident is symptomatic of growing Islamophobia in American society."

Following the press conference, A.M. made several national media appearances including Good Morning America, The Nightly Show with Larry Wilmore, and MSNBC. On September 17, 2015, the website The Daily Beast released an article entitled "'*Man, I Went Viral': My Day with [A.M.] the Most Famous Boy on Earth*." The article discussed Islamophobia, A.M. trending on Twitter, the additional media appearances—Ellen DeGeneres and Stephen Colbert—being offered to A.M., and the fact that his name came up in the Republican presidential debates. In addition to these appearances, President Barack Obama tweeted an invitation for A.M. to come to the White House and Hillary Clinton and Mark Zuckerberg expressed public support for A.M. Later, CAIR named A.M. as the American Muslim of the Year, A.M. attended astronomy night at

the White House, and inspired a Halloween costume. He also visited the president of Sudan and the Google Science Fair.

Following these events, Hanson and Shapiro participated in two separate television programs. Hanson appeared on The Glenn Beck Program[1] on September 22, 2015 and Shapiro appeared on The Kelly File[2] on October 19, 2015. During his interview, Hanson stated that the alarm clock incident was "a PR stunt" and a "staged event" with the intent to create an "influence operation." Hanson said that an influence operation is when "you take a situation and you create the appearance of something bad to get an effect." Hanson stated that this incident created the appearance of an anti-Muslim bias where there was none and this incident was used to "portray Muslims as victims" and "Americans as bigots." During Shapiro's interview, he asserted that the alarm clock incident was a "hoax" and a "setup" and that Mohamed used his son to advance his agenda.

Sometime after the clock incident, A.M. spent nine months in Qatar. Immediately upon his arrival back home, Mohamed sent out a news release that A.M. was back and ready to be interviewed.

## B. Procedural Background

In 2016, Mohamed filed suit individually and on behalf of A.M. against Hansen, CSP, and Shapiro asserting claims for defamation and defamation per se.[3] Hanson and CSP moved to dismiss the claims pursuant to chapter 27 of the Texas Civil Practice and Remedies Code by alleging that (1) Hanson's statements were non-actionable opinions, (2) Mohamed was required to prove actual malice because he was an all-purpose public figure or limited purpose public figure,

---

[1] The Glenn Beck Program is a news talk and political opinion show on TheBlaze—a news and entertainment network available on television, radio and the Internet—which is hosted by Glenn Beck.

[2] The Kelly File is a former news television program which was hosted by Megyn Kelly on the Fox News Channel.

[3] Mohamed also asserted claims against The Blaze, Inc., Glenn Beck, Fox Television States, LLC, Ben Ferguson, and Beth Van Duyne. Those claims were resolved and those parties are not a part of this appeal.

and (3) Mohamed could not establish actual malice. Shapiro also filed a motion to dismiss pursuant to chapter 27 in which he made the same arguments as Hanson and CSP as well as arguing that Mohamed could not show that Shapiro's statements were false. Shapiro sought to prove the affirmative defense that his statements were protected as "fair comments" and under the qualified privilege.

Mohamed then filed a first amended petition and responses to the motions to dismiss. The trial court (1) granted CSP and Hanson's motion to dismiss, (2) granted Shapiro's motion to dismiss and (3) awarded Hanson, CSP and Shapiro their attorney's fees and costs. Mohamed then filed a notice of appeal.

## ANALYSIS

### A.     Texas Citizens Participation Act

Chapter 27 of the Texas Civil Practice & Remedies Code, also known as the Texas Citizens Participation Act (TCPA), is an anti-SLAPP statute. *See* TEX. CIV. PRAC. & REM. CODE §§ 27.001-.011 (West 2015); *Serafine v. Blunt*, 466 S.W.3d 352, 356 (Tex. App.—Austin 2015, no pet.). "SLAPP" is an acronym for "Strategic Lawsuits Against Public Participation." *Serafine*, 466 S.W.3d at 356. The TCPA provides a procedure for expeditiously dismissing a non-meritorious legal action that is based on, relates to, or is in response to the party's exercise of the right of free speech, which is defined as a communication made in connection with a matter of public concern. *See Hersh v. Tatum,* 526 S.W.3d 462, 463 (Tex. 2017). In other words, the TCPA's purpose is to identify and summarily dispose of lawsuits designed only to chill First Amendment rights, not to dismiss meritorious lawsuits. *See In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015). The legislature has instructed that the TCPA "shall be construed liberally to effectuate its purpose and intent fully." *See* TEX. CIV. PRAC. & REM. CODE § 27.011(b); *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 898 (Tex. 2017).

### B. Orders Granting Motions to Dismiss

In his first issue, Mohamed contends that he presented clear and specific evidence sufficient to make a prima facie case of each element of his defamation claims against Hanson, CSP and Shapiro.

### 1) Standard of review

To obtain a dismissal under the TCPA, a defendant must show "by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of: (1) the right to free speech; (2) the right to petition; or (3) the right of association." *See* TEX. CIV. PRAC. & REM. CODE § 27.005(b). We review this determination de novo. *See Levatino v. Apple Tree Café Touring, Inc.,* 486 S.W.3d 724, 727 (Tex. App.—Dallas 2016, pet. denied). The burden then shifts to the non-movant to establish by clear and specific evidence a prima facie case for each element of the claim in question. *Id.* § 27.005(c). The statute does not define "clear and specific evidence," but the phrase has been interpreted to impose more than "mere notice pleading." *In re Lipsky*, 460 S.W.3d at 590–91. Instead, a plaintiff must "provide enough detail to show the factual basis for its claim." *Id.* at 591. Although the TCPA initially demands more information about the underlying claim, the TCPA does not impose an elevated evidentiary standard or categorically reject circumstantial evidence. *Id.*

If the non-movant fails to meet this burden, the trial court must dismiss the action. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(b). However, even when the non-movant satisfies the second step, the court will dismiss the action if the defendant "establishes by a preponderance of the evidence each essential element of a valid defense" to the plaintiff's claim. *Id*. § 27.005(d).

### 2) Step One: Did the appellees show that the TCPA applied to their claims?

In this case, Mohamed does not contest the fact that the lawsuit is based on, relates to, or is in response to appellees' exercise of: (1) the right to free speech; (2) the right to petition; or (3) the right of association. Accordingly, we proceed to the second step of the TCPA analysis.

### 3) Step Two: Did Mohamed establish a prima facie case for his claims?

We must next consider whether Mohamed met his burden by establishing, by clear and specific evidence, a prima facie case on his causes of actions for (1) defamation and (2) defamation per se.

### i) Defamation

A cause of action for defamation requires (1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages. *In re Lipsky*, 460 S.W.3d at 593. The status of the person allegedly defamed determines the requisite degree of fault. *Id.* A private individual need only prove negligence whereas a public figure or official must prove actual malice. *Id.* "Actual malice" in this context means that the statement was made with knowledge of its falsity or with reckless disregard for the truth. *Id.* Public figures fall into two categories: (1) all-purpose, or general-purpose, public figures and (2) limited-purpose public figures. *See WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). General-purpose public figures are those individuals who have achieved such pervasive fame or notoriety that they become public figures for all purposes and in all contexts. *Id.* Limited-purpose public figures, however, are only public figures for a limited range of issues surrounding a particular public controversy. *Id.* To determine whether an individual is a limited-purpose public figure, the Texas Supreme Court has adopted a three-part test: (1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; (2) the

plaintiff must have more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy. *Id.*

Applying these elements to this case, we must first determine whether this controversy was a public one. *Id.* A public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants. *See Lane v. Phares*, 544 S.W.3d 881, 889 (Tex. App.—Fort Worth 2018, no pet. h.). The Texas Supreme Court looked to the D.C. Circuit for assistance in determining the existence and scope of a public controversy:

> To determine whether a controversy indeed existed and, if so, to define its contours, the judge must examine whether the persons actually were discussing some specific question. A general concern or interest will not suffice. The court can see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment.

*See WFAA-TV, Inc.*, 978 S.W.2d at 572 (quoting *Waldbaum v. Fairchild Pub., Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980)). Here, the evidence in the record establishes that people were discussing the controversy as A.M made national media appearances, received an invitation to visit the White House, and inspired a Halloween costume. In addition, numerous commentators, analysts, and journalists were discussing both the incident and to what role prejudice had on A.M's suspension and arrest. Thus, the controversy was public, both in the sense that people were discussing it and people other than the immediate participants in the controversy were likely to feel the impact of its resolution.

The second element requires Mohamed have had more than a trivial or tangential role in the controversy. *See WFAA-TV, Inc.*, 978 S.W.2d at 571. To determine if Mohamed's and A.M.'s roles in the controversy were more than tangential, a court examines whether they (1) actually sought controversy, (2) had access to the media, and (3) voluntarily engaged in activities that necessarily involved the risk of increased exposure and injury to reputation. *See Hoskins v. Fuchs*, 517 S.W.3d 834, 842 (Tex. App.—Fort Worth 2016, pet. denied). Here, the record reflects that

Mohamed acted voluntarily to invite the press and public attention on several occasions and in several different ways during the course of the public debate. For example, Mohamed scheduled a press conference at their home and A.M. made numerous national media appearances including Good Morning America, The Nightly Show with Larry Wilmore, and MSNBC. Even after spending time away from the United States, Mohamed invited the press to interview A.M. immediately upon his return. Thus, by choosing to engage in activities that involved increased public exposure and media scrutiny, Mohamed and A.M. played more than a trivial or tangential role in the controversy.

Finally, the third and final element requires us to consider whether the alleged defamation is germane to Mohamed's participation in the controversy. *See WFAA-TV, Inc.*, 978 S.W.2d at 571. Here, the statements that Mohamed sued Hansen, CSP, and Shapiro for making in this case concerned whether the alarm clock incident was a hoax or setup or a staged event designed to create the appearance of an anti-Muslim bias. Thus, the alleged defamation directly relates to Mohamed's participation in the controversy.

Having determined that Mohamed is a limited purpose public figure, we now consider whether Mohamed presented clear and specific evidence sufficient to make a prima facie case of each element of his defamation claims against appellees. Here, we limit our analysis to whether Mohamed can make a showing of actual malice. Actual malice in the defamation context does not mean injurious motive or ill will toward the plaintiff, but means that the defendant had knowledge of the falsity of the statement or reckless disregard for the truth. *Lane*, 544 S.W.3d at 891. Reckless disregard requires more than mere negligence or a departure from reasonably prudent conduct. *Campbell v. Clark*, 471 S.W.3d 615, 629 (Tex. App.—Dallas 2015, no pet.). It requires a high degree of awareness of the probable falsity of the statements. *Id.* A defendant's state of

mind can be proven by circumstantial evidence and the evidence must be viewed in its entirety.

*Id.*

> To summarize, the actual malice standard requires that a defendant have, subjectively, significant doubt about the truth of his statements at the time they are made. To disprove actual malice, a defendant may certainly testify about his own thinking and the reasons for his actions, and may be able to negate actual malice conclusively. But his testimony that he believed what he said is not conclusive, irrespective of all other evidence. The evidence must be viewed in its entirety. The defendant's state of mind can—indeed, must usually—be proved by circumstantial evidence. A lack of care or an injurious motive in making a statement is not alone proof of actual malice, but care and motive are factors to be considered. An understandable misinterpretation of ambiguous facts does not show actual malice, but inherently improbable assertions and statements made on information that is obviously dubious may show actual malice. A failure to investigate fully is not evidence of actual malice; a purposeful avoidance of the truth is. Imagining that something may be true is not the same as belief.

*Bentley v. Bunton*, 94 S.W.3d 561, 596 (Tex. 2002).

Mohamed asserts that the "gist" of both Hanson's and Shapiro's statements was that A.M. brought a hoax bomb to school in order to "fan the flames of Islamophobia." He further asserts that, "within two days of A.M.'s arrest, it was widely publicized that: (1) the Irving Police Department had dropped all 'hoax bomb' charges against A.M., (2) the police investigation had quickly determined that A.M.'s clock was not dangerous, (3) there was 'no evidence to support the perception [A.M.] intended to create alarm;' and (4) there was no evidence that A.M. ever claimed the device was anything but a clock." Mohamed states that this is "objective, circumstantial evidence" that Hanson and Shapiro's statements were made with knowledge that their statements were false or made with reckless disregard for the truth. Mohamed also argues that because both interviews took place after A.M.'s arrest[4] that they had time to investigate their theories and determine there was no hoax or conspiracy.

---

[4] Hanson's interview took place over a week after A.M.'s arrest and Shapiro's took place more than a month after that.

Hanson argues that just because certain information was publicly available does not prove that he was aware of that information or that the media reports were accurate. Further, in his affidavit, Hanson stated that he believed in the veracity of his statements based upon his training and expertise acquired in the United States Army Special Forces, research resources (including the Daily Beast website, the CAIRtv YouTube channel, news articles) and a YouTube video that recreated the device A.M. took to school. Hanson concluded that he "firmly believed at the time, as I do now, that every statement I made on the Glen Beck Show was truthful and/or a reasonable opinion or judgment based upon true facts."

Shapiro also argues that Mohamed offered "no evidence of malice, much less clear and specific evidence." Shapiro also argues that a "defendant does not demonstrate actual malice merely by failing to somehow verify the subjective intentions of the plaintiff, and the Brief never explains how A.M.'s intentions could somehow be verified." Shapiro notes that he is not being "sued for lying about the Appellants but for interpreting the facts in a manner they do not approve of." In his affidavit, Shapiro concludes that he made his statements "without actual malice and without knowledge that they are in whole or in part untrue. In fact, I stand by my statements, having believed them to be true at the time I made them, and I continue to believe them to be true today." He further stated that he had "no independent knowledge of facts that would exonerate them of what I believe is their attempt to promote their agenda."

After a review of the evidence in its entirety, we conclude that Mohamed has not demonstrated a prima facie showing of actual malice. As stated above, to establish actual malice, a plaintiff must prove that the defendant made the statement with knowledge that it was false or with reckless disregard of whether it was true or not. *Lane*, 544 S.W.3d at 891. Mohamed failed to identify any evidence which did so. Even if it could be proven that Hanson and Shapiro were aware of the four "widely publicized" statements that Mohamed relied upon above and that the

–10–

statements were true, this assertion alone would not demonstrate malice. In this case, Hanson and Shapiro drew different conclusions from the events and formulated an opinion as to A.M.'s intent. Both note that A.M. still received a suspension from his school based upon his actions. Further, both Hanson and Shapiro relied upon the ties between Mohamed and CAIR. In his affidavit, Shapiro described CAIR as "an organization of which I was aware and which I knew the federal government had linked to Islamic terrorist supporters as an unindicted co-conspirator in a terrorism case." In Hanson's affidavit, he noted that Alia Salem, the executive director of the local chapter of CAIR, had accompanied A.M. to his MSNBC appearance and that an article on the Daily Beast had further noted Ms. Salem's role in scheduling A.M.'s appearances on news programs and late-night television. Hanson stated in his affidavit that "This article made it clear in my mind that CAIR—through its executive director, Ms. Salem—was connected to the Mohamed family and was directing the public relations aspect of the controversy for the Mohamed family." He further noted that "CAIR is known to be an Islamist organization with ties to the Muslim Brotherhood and Hamas." Finally, Hanson's and Shapiro's affidavits also explained their reasoning, what they relied upon in making such assertions, and a statement that they believed their statements to be truthful. Here, without more, Mohamed cannot establish that they made their statements with knowledge that they were false or had reckless disregard for the truth. Because Mohamed did not make a prima facie showing of actual malice for the challenged statements by Hanson and Shapiro, we overrule their first issue as to defamation.[5]

### ii) Defamation per se

Defamation per se refers to statements that are so obviously harmful that general damages may be presumed. *In re Lipsky*, 460 S.W.3d at 596. The law presumes certain categories of

---

[5] As we have affirmed the trial court's granting of the motion to dismiss based upon Mohamed's inability to present evidence of actual malice, we need not address the second issue raised by Mohamed and A.M. concerning Shapiro's alternative argument that his statements were protected by the qualified privilege.

statements are defamatory per se, including statements that (1) unambiguously charge a crime, dishonesty, fraud, rascality, or general depravity or (2) are falsehoods that injure one in his office, business, profession, or occupation. *See KTRK Television, Inc. v. Robinson*, 409 S.W.3d 682, 690 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). Here, Mohamed alleges that he produced clear and specific evidence that Hanson's and Shapiro's statements constituted defamation per se because "(1) the false statements accused Appellants of committing the crime of making, transporting, or possessing a hoax bomb; (2) the false statements accused Appellants of dishonesty, fraud, rascality, or general depravity; and (3) Hanson's false statements accused Appellants of being 'Islamists' or of furthering an Islamist Civilization Jihad."

To prove defamation per se, however, Mohamed would still need to prove the first three elements of defamation. *See Hancock v. Variyam*, 400 S.W.3d 59, n.7 (Tex. 2013) ("After *Gertz* and *Dun & Bradstreet,* there must still be a showing of fault in a defamation *per se* claim between private parties over a matter of private concern. *See* RESTATEMENT (SECOND) OF TORTS § 580B (1977). That appropriate standard of fault in such a case in Texas is negligence if the plaintiff is a private figure, *Foster v. Laredo Newspapers, Inc.,* 541 S.W.2d 809, 820 (Tex. 1976), or actual malice if the plaintiff is a public or limited-purpose public figure, *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 119 (Tex. 2000)."); *see also Van Der Linden v. Khan*, 535 S.W.3d 179, 198 (Tex. App.—Fort Worth 2017, pet. filed) ("The elements of a defamation action include (1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages. To prove a defamation per se claim, Khan must prove the first three elements, but not the fourth element, as he would be entitled to recover general damages without proof of any specific loss.") (internal citations omitted). In this case, as analyzed above, we concluded that Mohamed was unable to make a prima facie showing of actual malice for the challenged statements by Hansen and Shapiro. As such,

Mohamed is also unable to prove the necessary elements of defamation per se. Accordingly, we overrule Mohamed's first issue as to defamation per se.

## C.       Attorney's Fees

In his third issue, Mohamed argues that the trial court abused its discretion in refusing to reconsider its award of attorney's fees to Hanson and CSP "where their attorneys represented them pro bono."

### 1)       Additional facts

On January 9, 2017, the trial court granted Hanson and the Center for Security Policy's Anti-SLAPP Motion to Dismiss. The order provided that:

> IT IS FURTHER ORDERED, ADJUDGED, and DECREED that, in accordance with Texas Civil Practice and Remedies Code § 27.009(1), CSP Parties are entitled to recover their attorney's fees, court costs, and other expenses in bringing their Motion to Dismiss and defending against Plaintiffs' claims. CSP Parties are ORDERED to submit evidence of their attorney's fees, court costs, and other expenses by affidavit within 14 days of the date this order is signed. CSP Parties are also entitled to recover sanctions against Plaintiffs and all other further relief to which they may show themselves justly entitled, whether at law or in equity.

On January 19, 2017, Pete Row, on behalf of Hanson and the Center for Security Policy, filed a declaration in support of award of attorney's fees and sanctions. On February 22, 2017, the trial court entered an order granting Hanson and CSP's attorney's fees and costs. On March 20, 2017, Mohamed filed a Motion for Reconsideration of Award on Attorney Fees. In the motion, Mohamed argued that the TCPA only authorizes an award of costs, fees and expenses which have been "incurred in defending the legal action as justice and equity may require." *See* TEX. CIV. PRAC. & REM. CODE § 27.009(a). They argued that because Hanson and the Center for Security Policy had counsel who allegedly represented them pro bono, they did not actually "incur" any fees and were not entitled to an award of fees. On April 21, 2017, the trial court denied the motion for reconsideration.

–13–

### 2) Standard of review

Appellate courts review a trial court's award of attorney's fees under an abuse of discretion standard. *Avila v. Larrea*, 506 S.W.3d 490, 494 (Tex. App.—Dallas 2015, pet. denied). A court abuses it discretion if it rules without reference to guiding rules or principles. *Id.*

### 3) Analysis

In his brief, Mohamed argues that the American Freedom Law Center is a tax-exempt 501(c)(3) nonprofit organization which provides its services pro bono. In support of these assertions, Mohamed refers to the following documents which were attached to his motion for reconsideration: (1) the "donate" page of the American Freedom Law Center website; (2) the "fight for freedom" donation page of the American Freedom Law Center website; and (3) a copy of an article entitled *Offensive and Defensive Lawfare: Fighting Civilization Jihad in America's Courts* which was published by CSP.[6] Mohamed then argues that because there is evidence that David Yerushalmi and Robert Muise of the American Freedom Law Center provided their services pro bono, Hanson and CSP were not entitled to an award of their fees because they were not "incurred."

We note that a party seeking attorney fees under the TCPA bears the burden to put forth evidence regarding its right to the award, as well as the reasonableness and necessity of the amount of the fee. *Brownhawk, L.P. v. Monterrey Homes, Inc.*, 327 S.W.3d 342, 348 (Tex. App.—El Paso 2010, no pet.). In this case, Row put forth an affidavit that: (1) stated that Hanson and CSP retained himself and his law firm as well as Yerushalmi and Muise of the American Freedom Law Center to defend them in the lawsuit; (2) provided the billing rates for the attorneys and paralegals involved in the case; and (3) provided copies of redacted billing statements for both law firms.

---

[6] The article included the following sentence: "Mr. Yerushalmi is the co-founder and Senior Counsel of the American Freedom Law Center, a public interest law firm specializing in pro bono representation of exponents of religious and other freedoms."

In addition, the affidavit contained the following statements:

(1) "The fees billed by Defendants' attorneys are not contingent on the outcome of this litigation but are fixed hourly rates."

(2) "A portion of the attorney's fees that Defendants *incurred* were for the services performed by American Freedom Law Center paralegal Cindy Page."  (emphasis added).

(3) "In rendering my opinions regarding the amount of reasonable attorney's fees *incurred* (or, in the case of conditional appellate attorney's fees, to be *incurred* in the future) by Defendants, I have carefully considered the Texas Supreme Court's jurisprudence regarding what proof of attorney's fees should include." (emphasis added).

(4) "In rendering my opinions regarding the amounts of reasonable attorney's fees *incurred*, I have also carefully considered the factors set forth in Tex. Disciplinary R. Prof. Conduct 1.04, State Bar Rules, Art. 10 § 9, Rule 1.04." (emphasis added).

(5) "Performance of the specific tasks described in the detailed billing statements had required a total of 191.35 hours as of January 11, 2017.  As of January 15, 2017, only 188.35 hours had been billed to Defendants."

After a review of the relevant pleadings, we affirm the trial court's denial of the motion for reconsideration.  Mohamed's documents fail to provide any evidence that the American Freedom Law Center agreed to represent Hanson and CSP on a pro bono  basis in this case.  To the contrary, Row's affidavit affirms that Hanson and CSP retained Yerushalmi and Muise of the American Freedom Law Center, incurred non-contingent attorney fees from the American Freedom Law Center, and were billed for its legal services.  Accordingly, on this record, we cannot conclude that the trial court abused its discretion in denying Mohamed's motion for reconsideration and we overrule Mohamed's third issue.

## CONCLUSION

On the record of this case, we affirm the trial court's granting of the motions to dismiss and denial of the motion for reconsideration.

/David Evans/
DAVID EVANS
JUSTICE

170278F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MOHAMED MOHAMED,
INDIVIDUALLY AND ON BEHALF OF
A.M., A MINOR, Appellant

No. 05-17-00278-CV     V.

CENTER FOR SECURITY POLICY, JIM
HANSON AND BEN SHAPIRO,
Appellees

On Appeal from the 162nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-16-12579.
Opinion delivered by Justice Evans.
Justices Francis and Boatright participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees CENTER FOR SECURITY POLICY, JIM HANSON and BEN SHAPIRO recover their costs of this appeal from appellant MOHAMED MOHAMED, INDIVIDUALLY AND ON BEHALF OF A.M., A MINOR.

Judgment entered this 11th day of July, 2018.