**Affirm and Opinion Filed June 29, 2021**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-19-01433-CV**

**JACOB OLIVER, Appellant**
**V.**
**ELINOR ROWAN, ROY ROWAN, AND JULIE ROWAN, Appellees**

**On Appeal from the 162nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-17-06001**

## MEMORANDUM OPINION

Before Justices Myers, Partida-Kipness, and Garcia
Opinion by Justice Myers

Jacob Oliver appeals the trial court's judgment following a jury trial that he recover $500 damages and $3,000 attorney's fees through trial from Elinor Rowan and that he take nothing from Elinor's parents, Roy Rowan and Julie Rowan. Jacob brings five issues on appeal contending the trial court erred by (1) granting a directed verdict for appellees on Jacob's cause of action for fraud; (2) granting a directed verdict in favor of Roy and Julie for conspiracy to wiretap; (3) excluding Elinor's arrest records; (4) refusing to allow Jacob to testify about his loss of earning capacity; and (5) failing to award appropriate attorney's fees and costs. We modify

the judgment to award Jacob costs of court relating to his cause of action under the Texas Theft Liability Act, and we otherwise affirm the trial court's judgment.

## BACKGROUND

In early 2015, Elinor was working as a bartender at a restaurant, and Jacob was a medical student at University of Texas Southwestern Medical School (UTSW) studying to become a physician. They began dating, and Elinor moved into Jacob's apartment at UTSW in September 2015. Their relationship was troubled. Several incidents are relevant to this case.

Elinor testified that on April 23, 2016,[1] at the apartment, Jacob grabbed her, pushed her onto the bed, and started to choke her. She bit him on the arm, and he let her go. That night, after work, Elinor did not go back to the apartment but went to her parents' house, where she lived until May 11. The next day, April 24, she went to the apartment with her father when Jacob was there to get some of her possessions. On April 28, Jacob went to the restaurant where Elinor worked. As Elinor was leaving, Jacob tried to push her into her car and to steer her towards his car. She got away from him, but she testified she cut her arm during the altercation. Between then and May 8, she went to the apartment one or two times when Jacob was not there to get some of her belongings.

---

[1] Unless otherwise indicated, all dates are in 2016.

Jacob testified he believed someone was coming into the apartment when he was not there and taking things. On April 27, he picked up a prescription for Adderall. When it went missing, either from his car or from the apartment, he reported the theft of the Adderall to his physician. Jacob asked the apartment management to rekey his apartment.

On May 8, at 1:45 a.m., as Elinor was headed home from work, a Rockwall police officer pulled her over for a traffic violation, crossing into the opposing traffic lane. The officer concluded Elinor's driver's license was invalid. After seeing an open alcohol container, a beer can, in Elinor's car, the officer searched the car and found bottles of Adderall and some hydrocodone pills, both of which are controlled substances. The Adderall bottles indicated they were prescribed to Jacob. The officer asked, "Who is Jacob," and Elinor said he was her fiancé. The officer asked Elinor why she had the pills, and she said he "drove my car earlier." The officer then arrested her. Her father bailed her out of jail the next day. Elinor was charged with possession of controlled substances and driving with an invalid license.

Elinor's defense attorney told her she needed to get an affidavit from Jacob saying the pills found in her car were his and that he had left them in her car. A friend of Elinor's who was a paralegal told her that if Jacob refused to sign the affidavit, then she should try to record Jacob saying that the pills were his.

Elinor's father ordered a "spy gear" audio recorder that looked like and worked as a cellphone charger as well as an audio recorder. On May 11, Elinor

contacted Jacob and told him that after her arrest, her parents had kicked her out of their house. That was not true—her parents had not kicked her out of their house—but was a ruse to get Jacob to let her move back into his apartment, which he did. Elinor's father received the recorder on May 14, and Elinor began audio recording her time with Jacob on May 15.[2]

Elinor testified that on May 17, she was in Jacob's car in the apartment parking lot, when he started driving quickly around the parking lot. She jumped out of his car and hid under a stairwell. When she looked out from the stairwell, she saw Jacob letting the air out of her car's tires. She ran to the apartment with Jacob chasing her. When she got inside the apartment, she was holding a Taser, but she did not use it. Jacob knocked it out of her hand and stomped on it, breaking it. Jacob testified Elinor was drunk and that he let the air out of her tires because she told him she was going to drive. Elinor testified that she was not drunk at the time and that he deflated her tires to prevent her from leaving.

The next day, May 18, they had a physical altercation over a computer. The evidence shows Jacob told Elinor to get out of the apartment. Elinor went to a desktop computer, unplugged the cables from it, and tried to leave with it, telling Jacob it was her computer, that she had paid for it, and that she was taking it with

---

[2] The record includes some excerpts of the audio recordings as well as a 613-page transcription of the recordings.

–4–

her.[3] Jacob tried to force the computer away from her. As they tussled over the computer, Elinor fell to the floor, injuring her tailbone. Jacob told her she could take the computer if she let him remove his information and move it to another hard drive. Elinor refused, saying she knew he would not give it back to her or that he would change the password on the computer. He also told her she could not take the computer because it contained patient files, and it would be a HIPAA violation for her to take the computer with the files. Elinor left for work, driving there on her flattened tires, and Jacob went to his mother's house.

The next day, May 19, Elinor and her father returned to the apartment to get some of her belongings, and Elinor called the police. She told the UTSW police that Jacob had assaulted her the day before. She told the police she had recordings of her conversations with Jacob, and the officers asked for the recordings. Elinor's father sent the police a fourteen-minute excerpt of the recording that included the physical altercation over the computer.

The UTSW police informed the UTSW dean of medical students, Dr. Angela Mahalic, about the complaint against Jacob. Dr. Mahalic sent Jacob a letter informing him she had "received allegations that you have engaged in conduct that

---

[3] The actual ownership of the computer was disputed. Jacob maintained the computer was his because he had purchased it with his credit card. Elinor testified the computer was purchased using Jacob's credit card so he could get the "points" for the purchase, but she testified she was the real purchaser of the computer and that it belonged to her because she had paid Jacob's credit card bill that included the computer. Jacob testified Elinor paid the credit card bill as reimbursement for him paying the rent for her apartment in Rockwall when Elinor had failed to pay it. Elinor testified she provided Jacob with cash for the rent payment, but Jacob testified he pulled money out of his account to make the rent payment. The computer's actual ownership is not relevant to any issue in the case.

endangers the health or safety of another person and the safety and security of UT Southwestern property or premises" in violation of the school's policies. The letter stated that the complainant told the police that Jacob had flattened two tires on the complainant's vehicle and "during an argument about a computer, you grabbed her and pushed her into a wall which resulted in visible bruising on her right arm." The letter directed Jacob to meet with Dr. Mahalic the following Monday.

Dr. Mahalic testified that during the meeting, Jacob admitted arguing with Elinor on May 17, becoming angry, and letting the air out of her tires. Dr. Mahalic testified, "He said he knew it was wrong and he was sorry he did it, and that he had apologized for letting the air out of the tires." Dr. Mahalic said Jacob "definitely admitted he did it in anger after a fight and argument." Jacob did not tell Dr. Mahalic he let the air out of the tires because Elinor was drunk and had said she was going to drive. Concerning the incident with the computer on May 18, Jacob admitted grabbing the computer and struggling with Elinor over it, but he denied touching, hitting, or hurting her. After the meeting, Dr. Mahalic concluded there was sufficient evidence that Jacob violated school policy by letting the air out of Elinor's tires on May 17, but there was insufficient evidence to conclude he had violated school policy in the May 18 struggle over the computer. On May 25, Dr. Mahalic sent Jacob notice that he was on disciplinary probation because of the May 17 incident. The notice informed Jacob of the steps to appeal the disciplinary action, but Jacob did not appeal this disciplinary action.

On May 24, Elinor went to the apartment with some friends and movers and took her clothing and furniture. Jacob's mother went there the next day; she noticed items belonging to Jacob were missing, and she called the police.

On May 26, Jacob traveled to Florida, where he took the Step exam, which is an exam medical students must pass in order to continue in medical school. Jacob took the Step exam in Florida on May 31, and he passed it.

While Jacob was in Florida, Elinor was interviewed by UTSW Police Detective Cynthia Laredo about the incidents on May 17 and 18. The interview was video recorded. Elinor described what happened and wrote out a statement. Elinor showed Detective Laredo the bruises on her arms she said she sustained in the incident, and Detective Laredo took pictures of them. Based on the interview, Elinor's written statement, her bruises, and the audio recording, Detective Laredo obtained an arrest warrant for Jacob.

On June 14, Jacob his attorney met with Detective Laredo, and his interview was also video recorded. Detective Laredo read Jacob the *Miranda* warnings. Jacob's attorney asked Detective Laredo if Jacob was in custody, and Laredo said he was not in custody and that the warnings were precautionary. She did not tell Jacob or his attorney that she had a warrant for Jacob's arrest. Jacob explained his version of events for May 17 and 18, including asserting that Elinor was intoxicated on May 17 when he let the air out of her tires. Detective Laredo then played an

–7–

excerpt of Elinor's audio recordings, and she told Jacob a warrant for his arrest had been signed the previous week and that he was under arrest.

The following week, Dr. Mahalic received a copy of the UTSW police report. After reviewing it, she sent Jacob "Notice of Disciplinary Action: Expulsion." The notice stated Jacob was "expelled and permanently separated from UT Southwestern Medical School, effective immediately." The notice informed Jacob of his right to "contest the charges before an impartial hearing officer." The notice discussed the police report and referred to Elinor's written statement and the audio recording.

Jacob requested a hearing to contest the disciplinary charges. A hearing was held before the dean of UT Southwestern Medical Center. At the beginning of the hearing, Jacob objected to the hearing going forward because he had not received the audio recording or color photographs showing Elinor's bruises. Jacob asserted that under UTSW's procedural rules for student disciplinary hearings, he had a right to review all the evidence. Dr. Mahalic explained she did not have the recording or the color photographs. She stated that the notice's quotation from the recording came from the police report and not from her having heard the audio recording. Dr. Mahalic said the recording and color photographs would not be used in UTSW's evidence against Jacob. Dr. Mahalic quoted the portions of the police report that discussed the recording. Dr. Mahalic explained that she had never heard the recording and had never had it in her possession. The dean presiding over the hearing determined that, because the recording and photographs would not be used

–8–

in evidence, Jacob did not have a right to review them before the hearing. The dean overruled Jacob's objection and stated the hearing would proceed. Jacob stated that his expulsion without the opportunity to have a copy of the recording and photographs at the hearing was contrary to UTSW's published policy, and he and his attorney then left the hearing. The hearing proceeded without Jacob present. The evidence included testimony from witnesses, including testimony from the officer who interviewed Elinor on May 19, Detective Laredo, and Dr. Mahalic. Dr. Mahalic's decision to expel Jacob was upheld. Jacob had the right to appeal the result of the hearing to the president of the university, but he did not do so.

On December 20, Elinor obtained a two-year protective order against Jacob. The order required Jacob to complete a batterer's intervention and prevention counseling program.

Concerning Jacob's criminal assault charge, the assistant district attorney decided to dismiss that charge after listening to part of the audio recording. In agreement with Elinor and her family, the district attorney required Jacob to complete the batterer's intervention and prevention counseling program, which he was already attending as required by the protective order. After he completed the program, the criminal charges against him were dismissed.

Elinor pleaded guilty to two counts of possession of controlled substances listed in penalty groups 2 and 3. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.116, .117. She successfully completed a period of deferred-adjudication

probation for those charges. The court issued an order prohibiting law enforcement officials from disclosing the records of those cases. Another court entered an expunction order on three other cases relating to the May 8 arrest, two for possession of controlled substances not listed in a penalty group and one for driving with an invalid license. *See id.* § 481.119; TEX. TRANSP. CODE ANN. § 521.457.

Jacob brought this suit for damages against Elinor and her parents.[4] Jacob alleged causes of action for defamation, trespass, illegal wiretap, theft/conversion, conspiracy to commit these torts, malicious prosecution, and fraud. Jacob demanded damages for loss to his earning capacity as a result of his being expelled from medical school. The trial court granted a directed verdict in favor of Elinor's parents as to all claims against them and a directed verdict for Elinor and her parents on the claim of fraud. The remaining claims were submitted to the jury. The jury found that Elinor published a defamatory statement to a third party but that the defamatory statement was not false. The jury also found that Elinor committed theft and that the fair market value of the items she took was $500. The jury found Jacob failed to prove his causes of action against Elinor for trespass, illegal wiretap, and malicious prosecution. The parties submitted the issue of attorney's fees for the theft cause of action to the trial court. Jacob and his attorney asserted $118,199.50 should be awarded for attorney's fees for the theft cause of action through trial with additional

_____

[4] Jacob also sued UTSW in federal court.

–10–

amounts for appeal. The trial court awarded $3,000 attorney's fees through trial, and $10,000 and $5,000 in the event of appeals to the court of appeals and supreme court, respectively.

**FRAUD**

In Jacob's first issue, he contends the trial court erred by granting appellees' motion for directed verdict on his claim of fraud. The standard of review for a directed verdict is a legal sufficiency or "no evidence" standard of review. *LG Ins. Mgmt. Servs., L.P. v. Leick*, 378 S.W.3d 632, 642 (Tex. App.—Dallas 2012, pet. denied). In reviewing the legal sufficiency of the evidence, we must determine whether the nonmovant produced more than a scintilla of probative evidence to raise a fact issue on the material questions presented. *Id.* We consider all the evidence in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the movant. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). A directed verdict is improperly granted if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). "More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable, fair-minded persons to differ in their conclusions." *Id.* (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no

–11–

more than create a mere surmise or suspicion' of a fact." *Id.* (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

To prevail on a claim of common law fraud by affirmative misrepresentation, a plaintiff must prove (1) the defendant made a material misrepresentation that was false; (2) the defendant (a) knew the representation was false or (b) made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and thereby suffered injury. *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018); *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001).

To support the causation element of fraud, the plaintiff must prove proximate causation. *S & I Mgmt., Inc. v. Choi*, 331 S.W.3d 849, 856 (Tex. App.—Dallas 2011, no pet.). The components of proximate cause are cause in fact and foreseeability. *Id.* The test for cause in fact is whether the defendant's conduct was a substantial factor in bringing about the injury that otherwise would not have occurred. *Id.*

Jacob pleaded that Elinor, in conspiracy with her parents, falsely represented to Jacob that she wanted to reconcile. He alleged this misrepresentation was to gain entrance to his apartment for the purpose of recording him without his consent, provoke him to anger and record his responses while Elinor feigned injury or pain on the recordings in order to fabricate charges of domestic abuse. He alleged

–12–

appellees planned to use the false domestic-abuse charges to extort a false affidavit from him to obtain a dismissal of Elinor's criminal charges. Jacob alleged he relied on Elinor's representations and let her move back in with him. He alleged that when he told her he could not truthfully provide the affidavit, "she immediately provided false and misleading statements to the police, resulting in prosecution of Plaintiff and his expulsion from medical school."

It was undisputed that Elinor falsely represented to Jacob that her parents had refused to let her live with them after her arrest. It was also undisputed Elinor wanted Jacob to sign an affidavit that would show she was not guilty of possession of a controlled substance. The transcription of the recordings showed they frequently discussed the affidavit, what it should say, and whether Jacob would sign it. Sometimes, Jacob said he would sign it because he loved her and did not want her to go to jail. At other times, Jacob told her he would not sign an affidavit because he hated her and wanted her to be punished. And sometimes, he said he would not sign it unless she performed certain activities for him, including her signing an affidavit stating he did not owe her any money.

It was also undisputed that she recorded their conversations for four days, from May 15 to May 18, hoping that Jacob would say something to show she was not guilty of possession of a controlled substance. However, the record contains no evidence that she made the false representations to Jacob with the intent to either have him assault her or to get him expelled from medical school. The record shows

–13–

Elinor and her parents spent thousands of dollars trying to help Jacob pass the Step exam, including paying for him to attend exam-preparation courses in Dallas and Chicago for a few weeks. Dr. Mahalic, the UTSW dean of medical students, testified she determined Jacob should be expelled after she reviewed the police report and concluded it was likely that the assault discussed in the police report occurred. No evidence shows Elinor's false representations of needing his help or wanting to reconcile with him was a cause in fact of his expulsion from medical school. Instead, the record shows his expulsion was the result of his engaging in a physical altercation with Elinor for possession of a computer.

Moreover, Jacob's alleged conspiracy theory is illogical. That theory is that Elinor lied her way into Jacob letting her live with him again so she could record provoking him to anger, record his responses, pretend to be injured, file false criminal charges against him to get him expelled from medical school, and use those charges to extort him into signing a false affidavit exculpating her from the criminal charges she faced for possession of a controlled substance.[5] Jacob does not explain

---

[5] Jacob alleged in his petition:

> The purpose of the deception was to provoke Plaintiff to anger, record his responses, and feign injury or pain on the recordings to fabricate charges of domestic abuse. These charges could then be used to extort a false affidavit from Plaintiff for purposes of Elinor Rowan's criminal drug possession charges arising from her theft of Plaintiff's Adderall.

He stated in his appellant's brief:

> Oliver complained Rowan and her parents schemed to extort a false affidavit from him to escape criminal prosecution for prescription medication she stole from him. The scheme involved surreptitious recordings, and what Oliver contends were false criminal charges calculated to get him expelled from medical school.

what leverage Elinor would have had over him after he was expelled from medical school and criminal charges were pending against him. Nothing in the record shows anything Elinor could have done at that point would have gotten him readmitted to medical school. Nor does any evidence, direct or circumstantial, show Elinor believed her withdrawal of the accusation would gotten Jacob readmitted to medical school.

Although Jacob did not allege or argue it this way, perhaps Jacob meant Elinor's plan was to extort an affidavit from him before he was expelled by offering to tell the police she had falsely accused him. However, there is no evidence to support this theory either. For such a plan to have succeeded, Elinor would have to have contacted Jacob after the May 18 incident. There is no evidence that she did so. Nor is there any evidence that she had planned to do so but changed her mind.

We conclude no evidence shows Eleanor's misrepresentations and Jacob's reliance on them were a cause in fact of Jacob's expulsion from medical school and his being charged with assault, and the trial court did not err by granting a directed verdict on Jacob's claims of fraud and conspiracy to defraud.

## CONSPIRACY TO WIRETAP

In his second issue, Jacob contends the trial court erred by granting Roy and Julie Rowan's motion for directed verdict on Jacob's cause of action for conspiracy to wiretap. Section 16.02 of the Texas Penal Code provides,

(b) A person commits an offense if the person:

–15–

(1) intentionally intercepts, endeavors to intercept, or procures another person to intercept or endeavor to intercept a wire, oral, or electronic communication;

(2) intentionally discloses or endeavors to disclose to another person the contents of a wire, oral, or electronic communication if the person knows or has reason to know the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

(3) intentionally uses or endeavors to use the contents of a wire, oral, or electronic communication if the person knows or is reckless about whether the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection . . . .

(c) It is an affirmative defense to prosecution under Subsection (b) that:

. . . .

(4) a person not acting under color of law intercepts a wire, oral, or electronic communication, if:

(A) the person is a party to the communication; or

(B) one of the parties to the communication has given prior consent to the interception, unless the communication is intercepted for the purpose of committing an unlawful act . . . .

TEX. PENAL CODE ANN. § 16.02(b), (c)(4).  A person whose oral communication is intercepted in violation of section 16.02 "has a civil cause of action against any person who intercepts, discloses, or uses or solicits another person to intercept, disclose, or use the communication."  TEX. CODE CRIM. PROC. ANN. art. 18A.502.

The charge instructed the jury that a defendant violates the "Texas Criminal Wiretap Act" if the defendant:

1. Intentionally disclosed Jacob Oliver's oral communication to another person when the defendant knew or had reason to know the information was obtained through an illegal interception;

2. Intentionally used the contents of Jacob Oliver's oral communication when the defendant knew or was reckless about whether the information was obtained through an illegal interception; or

3. Intentionally used or solicited another to use a device to intercept Jacob Oliver's oral communication.

The jury appears to have found Jacob failed to prove Elinor violated the Act.[6] The record did not show Elinor knew, had reason to know, or was reckless about whether her interceptions of Oliver's communications were illegal. Instead, the record showed she believed the interceptions were legal because she was a party to the intercepted communications. *See* PEN. § 16.02(c)(4)(A). Eleanor was clearly a party to all the audio recordings played for the jury, and Jacob does not identify any communication in the transcription of the recordings where Elinor was not a party to the communication.[7]

Jacob argues that Elinor's parents entered into a conspiracy with Elinor to violate the Act. The essential elements of a civil conspiracy are "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or

---

[6] We say "appears" because the jury question did not include a question asking whether Elinor, or anyone else, violated the Act. Instead, the jury question was a series of instructions and definitions that ended with the direction, "Answer 'Yes' or 'No.'" The jury answered "No." Regardless of how the jury question is read, there is no jury finding that Elinor or her parents violated the Act.

[7] Jacob testified there might have been times when the recorder was running and Elinor was not present, but there is no evidence that he made a communication during those times.

course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Agar Corp. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019). Conspiracy is not an independent tort but is a theory of vicarious liability "that imparts joint-and-several liability to a co-conspirator who may not be liable for the underlying tort." *Id.* at 140. Instead, it requires an underlying unlawful act. *Id.* at 141. The damages must come from the underlying wrongful act, not the conspiracy itself. *Id.* at 142.

In this case, there is no jury finding of an underlying wrongful act of a violation of the Wiretap Act. Nor does Jacob cite any evidence of a wrongful act. Elinor is obviously a party to all the communications in the excerpts of the audio recordings played for the jury. And Jacob does not point to any communications in the transcription of the audio recordings where Elinor was not a party to the communication. Jacob argues that he presented some evidence that she was not a party to all the communications because he testified that Elinor did not take her purse or charger/recorder with her every time she left the room. However, his testimony was not evidence that at those times the device recorded communications to which she was not a party. Therefore, Jacob failed to present evidence of a violation of the Act for which Elinor's parents could be held vicariously liable as conspirators.

Jacob argues that Elinor's parents are not entitled to the defense of being a party to the communication. Instead, their defense would be under section 16.02(c)(4)(B), "one of the parties to the communication has given prior consent to

–18–

the interception, unless the communication is intercepted for the purpose of committing an unlawful act." PEN. § 16.02(c)(4)(B). In this case, it is undisputed that Elinor, who was a party to the communications, gave consent to the interception. So the question is whether there is any evidence that the interception was "for the purpose of committing an unlawful act." *See id.* Appellees testified that the purpose of recording the conversations was to see if Jacob would admit that the pills the police found in Elinor's car belonged to him and that they were there because Jacob had left them in Elinor's car. Jacob does not explain, and we do not perceive, how this was an unlawful purpose.

Jacob argues the purpose of the recordings was to use them "as leverage to suborn perjury to get Elinor off drug charges," and that the defense under section 16.02(c)(4)(B) would not apply. Jacob's subornation-of-perjury theory, discussed above, is illogical and not supported by the evidence.

Jacob argues it was unlikely that the purpose of the recordings was to get Jacob to admit to ownership of the pills. Jacob points out that some of the pills were in bottles prescribed to him, so it was established that they were his pills. Jacob asserts that Elinor admitted in the recorded conversations that she took the pills from the apartment in order to demand money from Jacob. What the recordings show is that Elinor told Jacob she found the pills in her bag and she put them in her car to return to Jacob after he paid her money he owed her. On the recordings, Jacob said she was lying and that she took them from the shelf in the apartment. While Elinor's

–19–

taking the pills or failing to return the pills after she found them might have been an illegal act, Jacob does not explain what that has to do with the purpose of the recordings. The police on May 8 seized the pills Jacob asserts she took from the apartment, and she did not begin the recordings until May 15, a week after she lost possession of the pills. Thus, Elinor's taking or finding the pills occurred before the making of the recordings, and no evidence shows she ever demanded money to return the pills because the police seized the pills before she could make such a demand. Also, no evidence shows Elinor's parents had any knowledge that Elinor had taken Jacob's pills for the purpose of requiring him to pay her money.

We conclude Jacob has failed to show the trial court's granting a directed verdict on his cause of action against Roy and Julie Rowan for conspiracy to wiretap was reversible error. We overrule Jacob's second issue.

## ELINOR'S ARREST RECORDS

In his third issue, Jacob contends the trial court erred by excluding the police records of Elinor's arrest by the Rockwall Police Department on May 8, 2016. The trial court excluded the records based on an expunction order the court concluded applied to the arrest records. Jacob made an offer of proof of the records. *See* TEX. R. EVID. 103(a)(2) (offer of proof necessary to preserve error from exclusion of evidence).

The order granting expunction provided that Elinor was entitled to expunction of three cases from the May 8 arrest, namely, two cases of misdemeanor possession

–20–

of a controlled substance not in a penalty group, cause numbers CR17-0357 and CR17-0358, and one case of violation of an occupational driver's license, cause number CR16-1674. The Rockwall County district court ordered "that all records and files pertaining to the arrest be expunged." The order also stated that "[r]elated arrests (same or similar charge, date, or arresting agency) not specifically listed herein are excluded from this expunction order. However, records of such unexpunged arrests which would not have been generated except for the expunged arrest shall be expunged."

Elinor also pleaded guilty to two counts of felony possession of a controlled substance, cause numbers CR-1672 and CR-1673. She received deferred-adjudication community supervision for these offenses, which she successfully completed. The Rockwall court ordered that the law-enforcement agencies could not disclose the records related to those offenses. These felony offenses were not included in the expunction order.[8] *See Ex Parte R.P.G.P.*, No. 19-1051, 2021 WL 1933952, at *1, *2, *6 (Tex. May 14, 2021) ("misdemeanor offenses are eligible for expunction on an individual basis").

---

[8] Expunction would not have been available for these offenses because Elinor received court-ordered community supervision. *See* TEX. CODE CRIM. PROC. ANN. art. 55.01(a)(2); *see also Harris Cty. Dist. Attorney's Office v. J.T.S.*, 807 S.W.2d 572, 574 (Tex. 1991) ("[T]he expunction law clearly was not intended to allow a person who is arrested, pleads guilty to an offense, and receives probation pursuant to a guilty plea to expunge arrest and court records concerning that offense." (internal quotation marks omitted)).

–21–

Assuming that the trial court erred by excluding the arrest records because the felony possession offenses were not subject to expunction, we cannot reverse unless the trial court's error in excluding the evidence probably caused the rendition of an improper judgment. TEX. R. APP. P. 44.1(a)(1). Erroneous rulings on the admissibility of evidence are ordinarily not reversible where the evidence is cumulative and not controlling on a material issue dispositive of the case. *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989); *Crosby v. Minyard Food Stores, Inc.*, 122 S.W.3d 899, 903 (Tex. App.—Dallas 2003, no pet.). The error is harmless if other competent evidence of the fact in question appears elsewhere in the record. *Crosby*, 122 S.W.3d at 904. The appellant has the burden of demonstrating that the error constituted reversible error. *Meachum v. Comm'n for Lawyer Discipline*, 36 S.W.3d 612, 615 (Tex. App.—Dallas 2000, pet. denied);

Jacob argues the arrest records were "critical to Elinor Rowan's motivation for fraud, the illicit nature of the recordings she made, and are pertinent to the other claims of malicious prosecution and defamation." Jacob then lists the relevant information that the arrest records would have shown:

1. Elinor was suspected of using drugs by the arresting officer.

2. She was driving while her license was invalid with a previous conviction for that offense.

3. Elinor was pulled over because she was driving erratically, and swerved into the oncoming traffic lane (and not because Jacob made an anonymous report about her).[9]

4. Elinor had an open beer container in the car (thus supporting Jacob's accusations of her continued drinking).

5. Elinor told the officer that Jacob's pill bottles, observed to be on the floorboard and in the glove compartment, contained a mixture of pills.

6. Elinor identified Jacob as her boyfriend and claimed the pills were in her car because he had used her car the day before.

7. The officer found one of the prescription Adderall pills in a zipper pocket in Elinor's purse, indicating she had actually been consuming Jacob's prescription medication illegally.

8. The officer found other prescription medication not belonging to Jacob, including hydrocodone.

9. Elinor had retained an expired driver's license of Jacob's.

10. Elinor was being charged with a 2nd degree felony in connection with the possession of Jacob's medication.

Most of this evidence was admitted elsewhere in the record. Video recordings of the Rockwall police's stop and arrest of Elinor were in the record. Those videos show the officer stopped Elinor because of her erratic driving, and they confirm that Elinor strayed into the opposite lane. The videos also show the officer finding the beer can in Elinor's car, searching the car and finding drugs, asking Elinor who Jacob was and Elinor's answer that he was her fiancé, asking Elinor why Jacob's pills were

---

[9] Elinor testified she believed she was stopped and arrested because Jacob had made an anonymous tip to the police about her. In the transcription of the audio recordings, she tells Jacob she found on his phone an internet search "[o]n how to make an anonymous tip."

in her car and Elinor's answer that he "drove my car earlier." The recording also shows the officer found other pills but does not identify what they were. The transcription of the audio recordings Elinor made of her conversations with Jacob show that Elinor's possession charges included possession of hydrocodone. On the video recording of the arrest, the officer said she found a pill like those in the prescription bottles in Elinor's wallet. Elinor testified she sometimes consumed Jacob's Adderall pills even though she did not have a prescription. Elinor also testified that a prescription bottle the officer found in her car contained a mixture of medications.

What the excluded evidence showed that was not cumulative of evidence before the jury was that the officer suspected Elinor of using drugs, that Elinor had a prior conviction for driving with an invalid license, that an expired driver's license for Jacob was found in Elinor's purse, and that one of the offenses with which she was charged was a second degree felony. Jacob asserts the excluded evidence "contain[ed] information critical to Elinor Rowan's motivation for fraud, the illicit nature of the recordings she made, and are pertinent to the other claims of malicious prosecution and defamation." Jacob does not explain, and we do not perceive, how any of the noncumulative evidence described above would have affected Elinor's motivation for fraud, shown that her recordings were illicit, or been pertinent to the claims of malicious prosecution and defamation.

We conclude Jacob has not shown that the trial court's exclusion of the police records of Elinor's arrest was reversible error. We overrule Jacob's third issue.

**EXCLUSION OF EVIDENCE OF DAMAGES**

In his fourth issue, Jacob argues the trial court erred by excluding his testimony of his lost earning capacity as a physician. Jacob wanted to present his testimony as well as information from the Bureau of Labor and Statistics of what his earnings would have been as a physician. Jacob is not entitled to reversal unless he shows that the trial court's error probably caused the rendition of an improper judgment. TEX. R. APP. P. 44.1(a)(1). Jacob did not prevail on any of his causes of action where loss of earning capacity was a form of damages. We have overruled all of Jacob's issues that could result in a new trial on those causes of action. The only cause of action on which Jacob prevailed was theft/conversion, where the trial court instructed the jury that the measure of damages was the fair market value of the items stolen/converted (which the jury found was $500), mental anguish damages (which the jury found was $0), and an award of statutory damages up to $1,000 (which the jury found was $0). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 134.005(a)(1). Therefore, we conclude any error of the trial court by excluding Jacob's testimony and evidence of his lost earning capacity could not have caused the rendition of an improper judgment and was not reversible error. *See id.* We overrule Jacob's fourth issue.

## ATTORNEY'S FEES AND COSTS

In his fifth issue, Jacob contends the trial court erred by failing to award him appropriate attorney's fees and costs on his cause of action under the Texas Theft Liability Act. Under section 134.005 of the Civil Practice and Remedies Code, a person who prevails in a suit under the Texas Theft Liability Act "shall be awarded court costs and reasonable and necessary attorney's fees." CIV. PRAC. § 134.005(b).

In the petition's allegations concerning the theft/conversion cause of action, Jacob alleged Elinor stole some of his pills as well as an iPad, clothing, kitchen items, and other items, which he alleged had a total value of $3,275. At trial, Jacob presented evidence of the items he believed Elinor took, but he did not present evidence of their fair market value. He testified his insurance co-pay expense for the pills Elinor took might have been $20; "it's minimal." Jacob presented no evidence of the value of any of the other items. Elinor admitted taking the iPad but returned it several years later; Jacob testified the iPad was broken and inoperable when she returned it, but he did not present evidence of its value.[10] The jury charge did not ask the jury to identify which items Elinor took. Instead, the jury found the fair market value of the items Elinor took was $500.

---

[10] In the transcription of the audio recordings, Jacob told Elinor that if she needed a computer she could keep the iPad; Elinor responded that she did not want it.

## Attorney's Fees

The award of attorney's fees to a prevailing party under the Texas Theft Liability Act is mandatory. *Schmader v. Butschek*, No. 05-15-00278-CV, 2016 WL 4119474, at *4 (Tex. App.—Dallas July 29, 2016, no pet.) (mem. op.). "However, a prevailing party entitled to attorney's fees is required to 'segregate fees between claims for which they are recoverable and claims for which they are not.'" *Id.* (quoting *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006)).

The parties agreed to the trial court determining the amount of attorney's fees. Appellate courts review a trial court's award of attorney's fees under an abuse of discretion standard. *Mohamed v. Ctr. for Sec. Policy*, 554 S.W.3d 767, 778 (Tex. App.—Dallas 2018, pet. denied). A court abuses its discretion if it rules without reference to guiding rules or principles. *Id.*

Jacob's attorney, John Crouch, submitted an affidavit in support of his request for attorney's fees. In the affidavit, Crouch stated his reasonable and necessary fees for the case through the jury trial were $128,035 for 320.05 hours at a rate of $400 per hour. Crouch stated that 8.2 hours were spent researching and developing claims other than the theft claim. That amount represented $3,280, and he deducted that amount from the attorney's fees, leaving a fee of $124,755. Crouch estimated that at least ninety percent of the time would have been necessary to pursue the theft claim, so he applied a discount rate of ten percent, reducing the attorney's fees to $112,729.50. He stated the discount rate would have been 20 percent if the theft

claim had not included the Adderall. Crouch stated that all his fees since trial involved the theft claim and constituted 13.3 hours at $400 per hour for $5,320, which increased the fee to $117,599.50. Crouch estimated his fee for the hearing on the motion for judgment pertaining to the theft claim would be $600, making the total amount of attorney's fees for the theft claim $118,199.50.

Elinor's attorney, Roger Foster, filed a response stating that a reasonable rate for an attorney of Crouch's experience, based on the evidence Crouch submitted, was $300 per hour. Foster stated that Crouch's billing records contained only one direct reference to the theft claim, references to the iPad, for 0.9 hours. Foster asserted the reasonable and necessary attorney's fee for Crouch's services on the theft claim should be $270.

The trial court found "that the reasonable and necessary attorney's fees that Plaintiff is entitled to recover from Defendant Elinor Rowan for recovering $500.00 on his claim for violation of the Texas Theft Liability Act is $3,000."

In *Arthur Andersen & Co. v. Perry Equipment Co.*, 945 S.W.2d 812 (Tex. 1997), the Texas Supreme Court listed eight factors that courts should consider when determining whether an attorney's fee is reasonable. *Id.* at 818. Those factors are:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;
>
> (2) the likelihood . . . that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Id.* (quoting TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.04). The trial court may draw upon its common knowledge and experience in considering these factors. *Moreno v. Reliable Insulation, Inc.*, 217 S.W.3d 769, 771 (Tex. App.—Dallas 2007, no pet.). Some courts have described the trial court as being an "expert on the reasonableness of attorney's fees." *See Matter of Estate of Poe*, 591 S.W.3d 607, 651 (Tex. App.—El Paso 2019, pet. pending); *McMahon v. Zimmerman*, 433 S.W.3d 680, 693 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (citing *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004)).

According to Crouch, he had to prove almost all the same facts for the theft cause of action as for the defamation, fraud, malicious prosecution, trespass, and illegal wiretap causes of action. The trial court apparently disagreed with Crouch on that point. The trial court could reasonably have concluded that the theft cause of action did not constitute ninety percent of the evidence. Instead, the court could have concluded it constituted only a small part of the evidence. Jacob's case for the theft of the items came from his and his mother's testimony. The court could reasonably have determined that the rest of the evidence, including the lengthy

testimony about Jacob and Elinor's troubled relationship, her recording their conversations, the fight over the computer, whether he assaulted her at different times, why he let the air out of her tires, the frequency with which Elinor was intoxicated, both their arrests and criminal charges, and what Elinor did with the Adderall, was not a reasonable and necessary part of the theft cause of action.

The court may also have considered "the amount involved and the results obtained." *Arthur Andersen*, 945 S.W.2d at 818. The theft cause of action, as pleaded, asserted damages of $3,275, plus the value of the Adderall. Jacob presented no evidence of the fair market value of any of the items allegedly taken. For the Adderall, he testified his out-of-pocket cost was about $20. The jury found the fair market value of the items taken was $500. The court could have concluded that attorney's fees of $118,199.50 were not reasonable on a claim worth no more than $3,295 ($3,275 for the values alleged in the petition plus $20 for the Adderall), and for which the jury found $500 damages. Jacob and Crouch were requesting attorney's fees of over 236 times the amount of damages found by the jury. The court, drawing upon its common knowledge and experience, could have concluded that a fee of six times the damages was more reasonable.

We conclude Jacob has not shown the trial court abused its discretion by awarding him attorney's fees of $3,000.

**Costs**

The award of costs to a party who prevails under the Texas Theft Liability Act is mandatory. *See* CIV. PRAC. § 134.005(b). In the motion for judgment, Jacob asked the trial court to award him costs. The trial court's failure to award Jacob the costs for his cause of action under the Texas Theft Liability Act was an abuse of discretion.

We sustain Jacob's fifth issue to the extent it challenged the trial court's failure to award costs relating to Jacob's cause of action under the Texas Theft Liability Act, and we overrule the issue to the extent it challenged the award of attorney's fees.

## CONCLUSION

We modify the judgment to award Jacob costs of court related to his cause of action under the Texas Theft Liability Act, and we remand the cause to the trial court for determination of those costs. We affirm the trial court's judgment in all other respects.

/Lana Myers//
191433f.p05          LANA MYERS
JUSTICE

–31–



## Court of Appeals
## Fifth District of Texas at Dallas

### JUDGMENT

JACOB OLIVER, Appellant

No. 05-19-01433-CV      V.

ELINOR ROWAN, ROY ROWAN,
AND JULIE ROWAN, Appellees

On Appeal from the 162nd Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-17-06001.
Opinion delivered by Justice Myers.
Justices Partida-Kipness and Garcia
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

> The judgment is **MODIFIED** to order that Jacob Oliver recover from Elinor Rowan costs of court related to his Texas Theft Liability Act cause of action.

It is **ORDERED** that, as modified, the judgment of the trial court is **AFFIRMED**. We **REMAND** the cause to the trial court for determination of the costs of court related to the Texas Theft Liability Act cause of action.

It is **ORDERED** that appellees ELINOR ROWAN, ROY ROWAN, AND JULIE ROWAN recover their costs of this appeal from appellant JACOB OLIVER.

Judgment entered this 29th day of June, 2021.